IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OSCAR MANZANO-MORA,

    Plaintiff,

    v.                             Civil Action No. DKC-22-3011

PATUXENT INSTITUTION,
LUM MAXIMUANGU,
DR. MOULTRIE, and
TOYIN OLASEHINDE,

    Defendants.

**MEMORANDUM OPINION**

Pending before the court is a motion to dismiss or for summary judgment filed on behalf of Defendant Patuxent Institution[1] (ECF No. 15) and a motion to dismiss or for summary judgment filed on behalf of Defendants Dr. Andrew Moultrie, Lum Maximuangu, NP, and Toyin Olasehinde, NP (the "Medical Defendants") (ECF No. 28).  Plaintiff Oscar Manzano-Mora opposes the motions.  ECF Nos. 21, 30 and 31.  No hearing is deemed necessary as the issues have been fully briefed.  *See* Local Rule 105.6 (D. Md. 2023).  For the reasons set forth below, Defendant Patuxent Institution's motion, construed as a motion to dismiss is granted.  The Medical Defendants' motion, construed as a motion to dismiss as to Toyin Olasehinde, NP, is granted and construed as a motion for summary judgment as to Dr. Andrew Moultrie and Lum Maximuangu, NP, is denied.

---

[1]    The Clerk will amend the docket to reflect the full name of Defendant Patuxent Institution.

BACKGROUND

A.    Complaint Allegations

Plaintiff Oscar Manzano-Mora is an inmate currently confined to Clifton T. Perkins Hospital Center.  Mr. Manzano-Mora explains that on December 29, 2021, while confined at the Patuxent Institution ("Patuxent"), he was suffering from mental health problems and swallowed a pen.  ECF No. 1 at 12.  He told an unidentified correctional officer that he swallowed the pen but the officer accused him of lying and laughed.  *Id*. at 8, 12.  Nurses also accused Mr. Manzano-Mora of lying.  *Id*. at 12.  Mr. Manzano-Mora asked for medical assistance but he was not taken to the hospital until February 8, 2022, when the pen was surgically removed.  *Id*.  Prior to that, Dr. Moultrie and Lum Maximuangu, NP advised Mr. Manzano-Mora that he would need to excrete the pen and they "flooded" Mr. Manzano-Mora with medication to assist that process.  *Id*.  X-rays were taken on January 14, 2022, and on an unspecified date Mr. Manzano-Mora began to bleed.  *Id*.  Mr. Manzano-Mora states that he was "put on the [board]" because he sought medical help.  *Id*.  He also claims that he has suffered permanent injury as a result of the delayed medical care.  *Id.*

B.    Defendants' Response

    1.    Dr. Andrew Moultrie, Lum Maximuangu, NP, and Toyin Olasehinde, NP

Dr. Andrew Moultrie is a physician who was employed at Patuxent and treated Mr. Manzano-Mora relative to the swallowed pen.  ECF No. 28-7.  Lum Maximuangu and Toyin Olasehinde are nurse practitioners who were employed at Patuxent during the time at issue.  ECF No. 28-3, ¶ 2; ECF No. 28-6, ¶ 1.  While employed at Patuxent, Mr. Maximuangu regularly conducted medical rounds on housing unit L1 and also saw patients during sick call.  ECF No. 28-3, ¶ 6.

At the time of the events complained of, Mr. Manzano-Mora was 26 years old.  ECF No. 28-4 at 20.  Medical records from February 2021 demonstrate that he has an extensive history of mental health illnesses including diagnoses of schizoaffective and post-traumatic stress disorder ("PTSD"), with many prior psychiatric hospitalizations including several suicide attempts.  ECF No. 28-4 at 13.  At that time, he was prescribed Haldol, Depakote, Zoloft, Cogentin, and Abilify. *Id*.  On July 16, 2021, Mr. Manzano-Mora was transferred from Eastern Correctional Institution to Patuxent.  *Id.* at 18.

Patuxent is also known as the Correctional Mental Health Center.  ECF No. 28-3, ¶ 6; ECF No. 28-7, ¶ 5.  Patuxent houses inmates with various mental health needs.  Inmates with the most acute mental health needs are housed on unit L1 and are provided regular sessions with psychiatrists and mental health staff, as well as 24-hour nursing care. *Id*.

While housed at Patuxent, Mr. Manzano-Mora was transferred from L1 to M4 on December 21, 2021.  ECF No. 28-4 at 20.  On December 30, 2021, psychiatric nurse practitioner Samantha Archibong saw Mr. Manzano-Mora at his cell for inpatient care due to reports from the floor charge nurse that Mr. Manzano-Mora cut his wrists and reported he was suicidal.  *Id*.  Ms. Archibong reviewed Mr. Manzano-Mora's medical records which included a history of borderline personality disorder, antisocial disorder, and PTSD.  *Id*.  Mr. Manzano-Mora reported that he had been suicidal for a week, but no one was taking him seriously.  He also reported that the prior evening he swallowed a pen and that day he swallowed the bristle portion of a toothbrush and his stomach hurt.  *Id*.  Ms. Archibong discussed the case with the treatment team and made plans to transfer Mr. Manzano-Mora back to L1.  *Id*.  She also contacted medical staff to have them evaluate for the ingested objects.  She ordered that Mr. Manzano-Mora be placed in a strip cell to keep him

safe while awaiting his transfer to L1, ordered suicide precautions with checks every 15 minutes, and 1:1 inmate observation cell-side with no belongings allowed.  *Id.*

Later that day, Patience Musong, RN evaluated Mr. Manzano-Mora due to the reports of his ingesting a flex pen[2] and toothbrush.  ECF No. 28-4 at 23-24.  Mr. Manzano-Mora was alert and oriented and his vital signs stable.  He reported that he was trying to choke himself and the pen just went down.  He denied pain/discomfort, nausea/vomiting, or headache.  *Id.* at 23.

He was also seen on December 30, 2021, by Jumoke Omisore NP.  ECF No. 28-4 at 26-27.  Mr. Manzano-Mora reported that he swallowed a flex pen and the top of a toothbrush the previous night around 8:00 p.m.  *Id.* at 26.  He was described as alert and oriented and not in obvious distress.  He denied abdominal pain, nausea, vomiting, bloating, burning sensation, or loss of appetite.  He stated he had not had a bowel movement since the previous day and did not feel like having one.  *Id.*  He reported that he had eaten his breakfast and lunch without issue.  He was instructed to immediately report any abdominal distress to the nurses.  *Id.*  An abdominal x-ray was ordered to be taken as soon as possible.  *Id.*

A behavioral health nurse saw Mr. Manzano-Mora on January 2, 2022.  ECF No. 28-4 at 28.  During their meeting he complained of lower left quadrant abdominal discomfort.  *Id.*  He was given a one-time dose of Pepto-Bismol.  *Id.*  Two days later, Mr. Manzano-Mora was seen by psychiatrist Dr. Carl Sicard at his cell for inpatient psychiatry.  *Id.* at 30.  He again reported stomach pain from the swallowed objects.  *Id.*  Dr. Sicard noted that the x-rays ordered had not been taken and forwarded Mr. Manzano-Mora's complaint to Nicole Winters, RN who stated she would discuss with medical.  *Id.* at 31.

---

[2]    Dr. Moultrie explains that a flex pen is a writing pen that is not rigid.  It is shorter and flexible to minimize the chance that an inmate can use the pen to cause self-harm.  ECF No. 28-7, ¶ 8.

On January 4, 2022, Dr. Moultrie first evaluated Mr. Manzano-Mora due to his complaints of abdominal pain.  ECF No. 28-4 at 32; ECF No. 28-7, ¶ 9.  Dr. Moultrie noted that Mr. Manzano-Mora allegedly swallowed a pen the preceding week and that Mr. Manzano-Mora reported pain in the lower left quadrant when pressing on the area or when he strained.  ECF No. 28-4 at 32.  He did not complain of blood, nausea, vomiting, or change in appetite.  On examination, Mr. Manzano-Mora exhibited lower left quadrant tenderness at times but not when he was distracted.  He displayed "no guarding or rebounding."  *Id*.  Dr. Moultrie avers that because Mr. Manzano-Mora did not "objectively demonstrate pain during this encounter when distracted [he] was not sure that he was actually in pain."  ECF No. 28-7, ¶ 9.  Mr. Manzano-Mora was to remain on L1 and Dr. Moultrie planned to continue to monitor him and noted that an x-ray would be done when possible.  ECF No. 28-4 at 32.  While certain x-rays can be taken at Patuxent, the equipment for abdominal x-rays is located nearby at Jessup Correctional Institution ("JCI").  ECF No. 28-7, ¶ 10.  Dr. Moultrie explains that scheduling an inmate for x-rays at JCI requires coordination between security at both facilities as well as with transport officers.  *Id*.  On January 3, 2022, a radiology appointment was scheduled for Mr. Manzano-Mora to have abdominal x-rays on January 6, 2022, at JCI.  ECF No. 28-7, ¶ 10; ECF No. 28-5.

Dr. Moultrie avers that at this time, he was not certain Mr. Manzano-Mora had swallowed the objects as claimed and, if he did swallow them, whether he had already passed them.  ECF No. 28-7, ¶ 11.  He did not believe that there was an emergency or need to send Mr. Manzano-Mora to a hospital at that time.  *Id.*  Dr. Moultrie states that when a patient has a bowel perforation he would expect to see an increase in abdominal tenderness with more guarding and rebound as well as changes in bowel sounds and loss of appetite.  *Id*.  Mr. Manzano-Mora did not exhibit these symptoms when Dr. Moultrie saw him on January 4.  *Id*.

Max Maximuangu also saw Mr. Manzano-Mora on January 4, 2022, during rounds. ECF No. 28-4 at 34. He noted Mr. Manzano-Mora was evaluated in medical that morning for abdominal pain and was pending an x-ray of the abdomen. Although Mr. Maximuangu reported that Mr. Manzano-Mora did not complain of any pain or abdominal distress he encouraged Mr. Manzano-Mora to take in fluids and ordered Pepto-Bismol and Milk of Magnesia for stomach pain and constipation. *Id.*

Four days later, Mr. Maximuangu again saw Mr. Manzano-Mora during rounds. ECF No. 28-4 at 36. He reported doing well and that he was ready to leave L1. He appeared stable and did not report any medical concerns. *Id*.

On January 12, 2022, Linda Osuji-Brown, behavioral health LPN, saw Mr. Manzano-Mora. ECF No. 28-4 at 38. Mr. Manzano-Mora stated that he swallowed an object the preceding week and was taken to JCI for an x-ray, but the x-ray was not taken. He asked to return to JCI for the x-ray. *Id.* He also reported that he had taken milk of magnesia for seven days but did not believe that he had passed the object. Ms. Osuji-Brown advised medical staff of Mr. Manzano-Mora's concerns and generated a sick call for him. *Id.*

The next day, Mr. Maximuangu saw Mr. Manzano-Mora during rounds. ECF No. 28-4 at 40. He asked why his x-ray had not been completed. He also reported that he had used the milk of magnesia and had a bowel movement. He stated that he was eating, was not nauseated, and had not vomited. He reported mild pain around the middle of his stomach which he described as not severe with aching rather than cramping. *Id*. On examination, his stomach was soft and non-distended. Mr. Maximuangu again ordered Pepto-Bismol and submitted an order that Mr. Manzano-Mora be transferred to JCI in the morning for an x-ray. *Id*. On January 14, 2022, Mr. Manzano-Mora went to JCI for an x-ray. *Id.* at 42, 44.

Mr. Maximuangu next saw Mr. Manzano-Mora on January 22, 2022, during rounds for self-injurious behavior.  ECF No. 28-4 at 45.  Mr. Manzano-Mora reported that he had recently taken a piece from a mask and stabbed himself.  No signs of infection were noted.  Mr. Manzano-Mora did not offer any complaints of abdominal distress, nausea, or vomiting.  Mr. Maximuangu noted that the x-ray was completed and showed a probable foreign object in the mid-abdomen with no bowel obstruction.  *Id.*  Mr. Maximuangu ordered a laxative, Magnesium Citrate.  *Id.* at 47.

On January 24, 2022, Dr. Moultrie evaluated Mr. Manzano-Mora due to complaints of abdominal discomfort.  ECF No. 28-4 at 49.  Mr. Manzano-Mora reported that he suffered from right-sided abdominal pain when he strained to use the bathroom.  He also had right middle abdominal tenderness.  He reported there was no blood in his stool and that he had not suffered a loss of appetite.  He reported occasional nausea but no vomiting.  *Id.*  Dr. Moultrie noted the x-ray "showed a slim, linear opaque object about 1.46 cm in length at the L2 level in the mid-abdomen." *Id.*  Mr. Manzano-Mora did not exhibit any guarding or rebound on examination and Dr. Moultrie observed normal bowel sounds.  No masses or distention was observed.  Mr. Manzano-Mora reported that he had abdominal pains many times during the day which he characterized as sharp. *Id.*  Examination showed intermittent abdominal tenderness that was not present when Mr. Manzano-Mora was distracted.  *Id.* at 50.  Dr. Moultrie noted the need for another x-ray to determine if the object was still present and ordered additional x-rays.  *Id.* at 49-51.  Dr. Moultrie avers that although the x-ray showed the presence of the foreign object, he believed the object would pass through the stool.  ECF No. 28-7, ¶ 16.  He indicates that his belief was bolstered given that Mr. Manzano-Mora still did not have pain when distracted, had no nausea or vomiting, and his bowel sounds remained normal.  *Id.*  As such, Dr. Moultrie avers that Mr. Manzano-Mora's condition did not present an emergency and there was no need to send him to the hospital.  *Id.*

Dr. Sicard, a psychiatrist, saw Mr. Manzano-Mora on January 26, 2022.  ECF No. 28-4 at 52.  At that time Mr. Manzano-Mora was on suicide precautions, having reported suicidal ideation the previous day along with intermittent auditory hallucinations.  *Id*.  Mr. Manzano-Mora was scheduled for an x-ray that day and complained to Dr. Sicard of right lower quadrant discomfort.  *Id*.  Dr. Sicard spoke with Dr. Moultrie who advised that Mr. Manzano-Mora did not need infirmary care because "his discomfort was not reproducible when distracted or engaged in conversation."  *Id.* at 52-53.  Dr. Moultrie also stated that there was no rebound tenderness and Mr. Manzano-Mora's abdomen did not appear distended.  He stated that he would call Dr. Sicard back when he knew more after receiving the result of the new x-rays.  *Id*. at 53.

Dr. Sicard saw Mr. Manzano-Mora the next day.  ECF No. 28-4 at 54.  "Immediately after he was greeted [by Dr. Sicard] he began complaining about trouble with his bowel movements."  *Id*. at 54.  Mr. Manzano-Mora sated that he had not had a bowel movement in two days and his stool was "greenish."  *Id*.  Dr. Sicard discussed Mr. Manzano-Mora's case with RN Winters who advised that she would make medical staff aware of Mr. Manzano-Mora's complaints.  *Id*. at 55.  Dr. Sicard also spoke with Dr. Moultrie who reported that the foreign object was moving down the gastro-intestinal tract.  *Id*.  Dr. Moultrie reported that the object was in Mr. Manzano-Mora's large intestine with no evidence of obstruction or free air.  He advised that another x-ray would be taken the following day and that since the object was moving it would eventually pass in Mr. Manzano-Mora's stool.  *Id.*  Dr. Sicard advised Dr. Moultrie that Mr. Manzano-Mora had not had a bowel movement in two days.  *Id.*  A new order was given for milk of magnesia as needed daily and Colace 100 mg twice daily.  *Id*. at 56.  Dr. Moultrie ordered additional x-rays.  *Id.* at 58.  Dr. Moultrie avers that despite Mr. Manzano-Mora not having a bowel movement in two days, "it was

still likely that the object would pass in stool eventually, especially if the patient took laxatives to assist in moving the stool and the object."  ECF No. 28-7, ¶ 18.

Mr. Manzano-Mora had additional x-rays of his abdomen taken on January 28, 2022.  ECF No. 28-4 at 59.  He received milk of magnesia for constipation.  *Id.*

The next day behavioral health nurse Esther George saw Mr. Manzano-Mora because he was heard yelling and disturbing the tier.  ECF No. 28-3 at 59.  The nurse and a tier officer checked on him.  Mr. Manzano-Mora had blood on his fingers and reported that he had asked the nurse for something to make him feel high but she only offered Tylenol.  *Id.*  He stated that if he cut his wrists she would put him on the board and give him Ativan, Haldol, and Benadryl, which was what he stated he wanted.  *Id.*  Custody staff was called to the cell and removed him.  *Id.*  Ms. George saw an abrasion on Mr. Manzano-Mora's right wrist with traces of blood.  He advised that he used a staple to cut his wrists and threatened to continue to cut his wrist until he got what he wanted.  Dr. Sicard was notified and gave orders for Mr. Manzano-Mora to be placed in therapeutic restraints in a supine position with a strong sheet for up to 4 hours, if necessary, with checks every 15 minutes for self-injurious behavior.  *Id.*

Later, during provider rounds, NP Jumoke Omisore evaluated Mr. Manzano-Mora.  ECF No. 28-4 at 63.  Mr. Manzano-Mora was still restrained.  He had a superficial cut on his right wrist which was cleaned and covered with antibiotic ointment and a pressure bandage.  Mr. Manzano-Mora complained to Ms. Omisore that he was not able to defecate.  Ms. Omisore reviewed the results of Mr. Manzano-Mora's x-rays which showed some stool and bowel gas in the colon extending to the rectal vault along with a foreign body in the ascending colon.  Ms. Omisore ordered a magnesium citrate bottle to assist evacuation of the object and stool.  Mr. Manzano-Mora was released from the restraint board and given the magnesium citrate along with several

cups of water.  He had a large bowel movement.  He did not report any abdominal pain, nausea, or other gastrointestinal distress.  *Id*.

Dr. Sicard saw Mr. Manzano-Mora on January 31, 2022.  ECF No. 28-4 at 65.  He noted that Mr. Manzano-Mora had twice been placed in restraints the previous week:  once for throwing something at staff and then for the self-injury.  *Id.*  Mr. Manzano-Mora again reported abdominal discomfort for which he had been provided a laxative.  He stated that he had not expelled the foreign object he ingested.  Dr. Sicard planned to follow up with Dr. Moultrie (*id*. at 66) who ordered additional x-rays that day.  *Id*. at 67.

On February 2, 2022, behavioral health nurse Erick Tchoutang saw Mr. Manzano-Mora who reported he defecated seven times that day and there was blood in his stool.  ECF No. 28-4 at 68.  Dr. Sicard also saw Mr. Manzano-Mora that day.  *Id*. at 70.  Dr. Sicard noted that Dr. Moultrie advised Mr. Manzano-Mora had an x-ray of the abdomen and pelvis the preceding day and was awaiting the results.  *Id*. at 71.  Dr. Moultrie also reported that "the object(s) was at the junction of the sigmoid colon and rectum and so he anticipates passing or having passed object. . . ." *Id.*

The following day behavioral health Nurse Winters saw Mr. Manzano-Mora.  ECF No. 28-4 at 72.  Mr. Manzano-Mora again took milk of magnesia due to complaints of hard stool.  Although he had eaten his lunch and drank, he reported that he suffered from severe intermittent abdominal pain in the right lower quadrant with pain reported as 9 on a 10-point scale.  *Id*.  He also reported having two painful bloody stools and showed the nurse toilet paper that appeared to have red flecks on it.  *Id*.  Nurse Winters called medical staff and reported Mr. Manzano-Mora's complaints; medical staff directed Nurse Winters to bring Mr. Manzano-Mora to medical for further evaluation.  *Id.*  There, he was seen by Dr. Moultrie who noted that Mr. Manzano-Mora's history of ingesting foreign objects which had been slow in moving, and that Mr. Manzano-Mora

had reported blood in his stool.  *Id.* at 74.  He also noted that Mr. Manzano-Mora recently had experienced diarrhea and reported his pain was fifteen on a 10-point scale and that Mr. Manzano-Mora was seen talking and laughing with others earlier that day.  *Id.*  Mr. Manzano-Mora's stool was dark brown and watery but was negative for blood in the stool.  He declined to have a rectal exam.  No guarding or rebound was observed on examination, however, right lower quadrant tenderness over an area the size of fifty cent piece was noted.  *Id.*  Bowel sounds were normal.  An x-ray was scheduled for the next morning.  *Id.*

Mr. Maximuangu saw Mr. Manzano-Mora the following day during rounds.  ECF No. 28-4 at 76.  Mr. Manzano-Mora again complained of blood in his stool.  He was asked to show his stool but had flushed it.  *Id.*

The next day, Saturday, February 5, 2022, a behavioral health nurse saw Mr. Manzano-Mora.  ECF No. 28-4 at 78.  He had requested all day to be sent to JCI due to his complaints of abdominal pain and discomfort and difficulty having a bowel movement.  He reported having a "small pellet-like" bowel movement with blood.  *Id.*  He showed the nurse a spot of blood on his clothing which he stated came from his rectum.  Medical staff was contacted about Mr. Manzano-Mora's complaints.  *Id.*  The on-call physician assistant ordered a stool sample be collected for testing and that Mr. Manzano-Mora follow up with a provider on Monday.  *Id.* at 80.  Although the order was given, Mr. Manzano-Mora did not produce a stool sample.  *Id.*

Mr. Maximuangu next saw Mr. Manzano-Mora on February 6, 2022.  ECF No. 28-4 at 81.  He complained that he had not had a bowel movement in four days.  Mr. Maximuangu noted that there was no evidence of obstruction but the recent x-rays were not in the electronic medical record.  *Id.*  He advised Mr. Manzano-Mora to stop taking laxatives to avoid developing dependence and advised that Mr. Manzano-Mora should only take a laxative once a week with the

goal to discontinue uses of a stool softener as well.  Mr. Maximuangu planned to review the x-ray if it was available in the morning.  *Id.*

The following day, behavioral health nurse Adiatu Yansaneh saw Mr. Manzano-Mora.  He complained that his stomach was "messed up" and he needed to go to medical.  ECF No. 28-4 at 83.  The nurse advised that he could be provided medication but he declined and stated that he wanted to go Medical.  *Id*.  The chart update was entered at 1:56 p.m.  *Id*.  Later that night, he was taken to medical where his history regarding of swallowing the flex pen was again noted by Mr. Maximuangu.  *Id*. at 85.  The note was entered in Mr. Manzano-Mora's chart at 8:55 p.m.  *Id.* at 85.  Mr. Manzano-Mora requested to be taken to the emergency room for evaluation and possible removal of the pen.  *Id*.  Mr. Maximuangu discussed the matter with Dr. Moultrie who was on call as well as with Dr. Temesgen, the Regional Medical Director, who approved Mr. Manzano-Mora's transfer to the hospital.  *Id*. 85, 87.  He was taken to Baltimore Washington Medical Center ("BWMC").  *Id*. 87, 89.

On February 8, 2022, Mr. Manzano-Mora had an x-ray taken in the BWMC emergency room.  *Id.* at 90.  A metallic object with a tube like structure around it was seen in the left lower quadrant.  *Id*.  A CT scan was performed which showed an "[a]cute perforation of the posterior wall of the mid sigmoid colon.  The distal blunt end penetrates the posterior wall with a small amount of fluid in the adjacent sigmoid mesentery or extraperitoneal fat.  A small amount of extraluminal air is adjacent to the perforation in the extraperitoneal fat."  *Id*.  The CT scan showed a perforated colon caused by the pen Mr. Manzano-Mora swallowed on December 28, 2021, and a surgical consultation was requested.  *Id*.

The following day, Mr. Manzano-Mora had a colonoscopy with biopsy.  ECF No. 28-4 at 91.  A pen was seen in the sigmoid colon at approximately the 50 cm level as well as well as a

perforation.  Mr. Manzano-Mora was directed to take nothing by mouth and was provided an enema as well as intravenous antibiotics.  *Id*.  Surgery was scheduled for the next day.  *Id*.  On February 10, 2022, Mr. Manzano-Mora continued to receive all medications ordered and nothing to eat pending surgery.  *Id*. at 92.

On February 11, 2022, Mr. Manzano-Mora underwent an open laparotomy, sigmoid resection with end to end anastomosis for intestinal perforation.  *Id*. at 93-94.  He remained at BWMC through February 18, 2022.  *Id*. at 95-97.

On February 18, 2022, after being discharged from the hospital, Mr. Manzano-Mora was sent to the Jessup Regional Infirmary ("JRI").  ECF No. 28-4 at 98.  His surgical wound was clean, dry, and intact and it was noted that his surgical staples were to be removed in two weeks. *Id*.  He was prescribed analgesic medication and placed on suicide precautions.  *Id*.

Nurse Patricia Durning saw Mr. Manzano-Mora that day.  ECF No. 28-4 at 100.  He complained of post-operative pain and was provided Percocet that evening:  he reported pain relief approximately 25 minutes later.  *Id*.  Mr. Manzano-Mora had what appeared to be a paper clip which he reported that he swallowed.  A medical provider was notified.  Meanwhile, Mr. Manzano-Mora tore a cabinet from the wall and threatened to swallow the screws from the cabinet.  *Id*.  The psychiatrist was notified and Haldol, Benadryl, and Ativan were ordered but Mr. Manzano-Mora refused to take the Haldol reporting he was allergic.  *Id*.  He took the other medications.  Dr. Obsu ordered that Mr. Manzano-Mora be taken to the emergency room for evaluation of his swallowing a foreign object.  *Id*.  He was taken back to BWMC.  *Id*.  A CT scan and x-ray of the abdomen and pelvis were taken which were unremarkable.  *Id*.  No foreign body was observed.  *Id*.  The following day, he was discharged from BWMC and returned to JCI where PA Abubaker saw him, admitted him to isolation, and placed him on suicide precautions.  ECF No. 28-4 at 101.

Mr. Maximuangu denies ignoring Mr. Manzano-Mora's medical needs.  He states that although Mr. Manzano-Mora swallowed a pen, it was believed that it would pass through his stool as x-rays showed it passing through the gastrointestinal tract.  ECF No. 28-3 at 14, ¶ 13.  Mr. Maximuangu explains that pens can be passed through stool and other patients have passed pens through their stool.  *Id.*  Mr. Maximuangu denies that there was any indication that Mr. Manzano-Mora's condition presented an emergency.  *Id.*  He states that he provided pain medication and laxatives to assist in the passing of the pen and when that failed he conferred with Drs. Moultrie and Temesgen.  *Id.*

For his part, Dr. Moultrie explains that it is possible for a flex pen to pass through the colon and out with stool.  ECF No. 28-7, ¶ 8.  Other inmates have swallowed flex pens and passed them. *Id.*  Dr. Moultrie states that it is difficult when treating mental health patients to determine if an object has been passed because they often expel the object and then re-swallow it without personnel knowing.  *Id.*  He denies ignoring Mr. Manzano-Mora's medical needs and explains that he monitored Mr. Manzano-Mora's condition and the location of the foreign object via repeat x-rays.  *Id.*, ¶ 31.  In his view, Mr. Manzano-Mora's symptoms did not reflect a medical emergency as his bowel sounds were normal and he did not have pain when he was distracted.  *Id.*  He also did not have nausea, vomiting, or lack of appetite.  *Id.*  Additionally, Dr. Moultrie states that because other inmates had passed flex pens in their stool, he believed that Mr. Manzano-Mora would do the same.  *Id.*  Dr. Moultrie states that Mr. Manzano-Mora was provided laxatives to assist in moving the object and, when that did not work and Mr. Manzano-Mora reported blood in his stool, he was sent to the hospital where the pen was removed.  *Id.*

Toyin Olasehinde, NP, did not provide any care to Mr. Manzano-Mora regarding his swallowing a pen.  ECF No. 28-6, ¶ 5.  When Ms. Olasehinde was being shown around Patuxent

in December 2021 and January 2022, Mr. Manzano-Mora threw urine on her.  *Id*.  Ms. Olasehinde

saw Mr. Manzano-Mora on March 31, 2022, in the dispensary for a provider visit.  ECF No. 28-4

at 11-12.  Ms. Olasehinde evaluated Mr. Manzano-Mora to renew his medication and to address

his concerns of a rash on his chest and back.  *Id*.  Ms. Olasehinde renewed Mr. Manzano-Mora's

prescription for Baclofen and prescribed hydrocortisone 1% for the rash.  *Id*.

     2.    Patuxent Institution

     Patuxent Institution states that it is entitled to Eleventh Amendment immunity, is not a

person amenable to suit under 42 U.S.C. § 1983, and is entitled to dismissal because Mr. Manzano-

Mora failed to exhaust his administrative remedies.  ECF No. 15.

C.    Mr. Manzano-Mora's Opposition

     Mr. Manzano-Mora states that prior to swallowing the pen, he advised medical staff that

he was hallucinating and hearing voices that directed him to harm himself and that he needed

assistance.  ECF No. 21 at 1.  After swallowing the pen, he experienced severe pain in his stomach

and complained to Defendants.  *Id*.  Lum Maximuangu, NP advised him that he was scheduled for

an x-ray on December 30, 2021.  *Id*.  Weeks passed and Mr. Manzano-Mora continued to complain

to nurses regarding his pain.  *Id*.  Ultimately, the pen damaged his colon and intestines  and surgical

removal of the pen was required.  *Id*.  Mr. Manzano-Mora states that he told staff about the pain

he was suffering for 45 days and ultimately had to "throw something at the doctor" to get their

attention and that resulted in them putting him on the "board."  ECF No. 30.  He was taken for an

x-ray the next day which showed that he already had a hole in his colon.  *Id*.  Dr. Moultrie refused

to send him to the emergency room despite his begging for treatment.  *Id*.  Mr. Manzano-Mora

states that medical staff were supposed to check on him every 15 to 30 minutes due to his attempt

at self-harm but failed to do so and minimized his problems in their notes.  *Id*.  He maintains that

Defendants should have sent him to the emergency room and for other diagnostic testing because swallowing a pen is an emergency and he was in a mental health crisis but was not provided treatment.  *Id.*   Additionally, Mr. Manzano-Mora explains that on three separate occasions he showed medical staff his bowel movements which contained blood, but no action was taken.  ECF No. 31 at 1.  He claims that after he asked to go to the emergency room, Dr. Moultrie and Lum Maximuangu, NP put him on the board instead of providing treatment.  *Id.*  He claims that both Dr. Moultrie and Lum Maximuangu, NP took part in his medical treatment but failed to help him.  *Id.*  He states that it took the intervention of Captain Williams to have him taken to the emergency room and that Dr. Moultrie and Mr. Maximuangu saw him throw up but provided no treatment.  *Id.*  He further claims that medical staff at the hospital questioned why he was not brought in for treatment sooner.  *Id.*

## STANDARD OF REVIEW

In reviewing the complaint in light of a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6), the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained that a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Defendants' dispositive motions are also filed in the alternative as motions for summary judgment. Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

A.     Eleventh Amendment Immunity:  Patuxent Institution

Patuxent Institution asserts that it is immune from claims against it under the Eleventh Amendment. Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and its departments are immune from suits in federal court brought by its citizens or the citizens of another state unless the state consents. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-202(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. As such, Patuxent Institution, an agency of the State of Maryland, is immune from suit and the complaint filed against it must be dismissed.[3]

---

[3]     The court need not address Patuxent's additional defenses.

B.      Personal Participation:  Toyin Olasehinde

Under Section 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).

The defendant's own action—or failure to act—is required for liability under § 1983.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).  There is no *respondeat superior* liability under § 1983.  *Love-Lane*, 355 F.3d at 782.  And official may be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights."  *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).

Here, Mr. Manzano-Mora has not alleged that Toyin Olasehinde personally participated in the alleged constitutional violations.  Mr. Manzano-Mora simply names Ms. Olasehinde as a defendant without providing any specific allegations against her.  Accordingly, Mr. Manzano-Mora's claims against Ms. Olasehinde are dismissed.

C.      Eighth Amendment:  Dr. Andrew Moultrie and Lum Maximuangu

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th

Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk.").  "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

It is undisputed that Mr. Manzano-Mora swallowed a pen which ultimately perforated his colon and required surgical extraction, i.e., a serious medical need.  Dr. Moultrie and Mr. Maximuangu focus instead on whether the record supports a finding of deliberate indifference by them in response to Mr. Manzano-Mora's medical need.

Both Dr. Moultrie and Lum Maximuangu state that they believed that Mr. Manzano-Mora would pass the pen in his stool as other inmates had done.  Dr. Moultrie also states that he monitored Mr. Manzano-Mora's condition via repeated x-ray and because of the lack of certain

symptoms and the presence of others, e.g. normal bowel sounds, no vomiting, and distractibility from pain, he believed that his observation of Mr. Manzano-Mora was the appropriate course of treatment.  Mr. Manzano-Mora's full medical record has not been provided to the court.  What seems apparent form the records provided, however, is that the follow-up observations of Mr. Manzano-Mora were not occasioned by Dr. Moultrie or Mr. Maximuangu's independent actions but rather were triggered by inquiries from mental health staff who regularly had to contact medical staff as to Mr. Manzano-Mora's complaints and treatment plan.  It was only after these inquiries that Dr. Moultrie took action to request further x-rays.  Additionally, in his opposition responses, Mr. Manzano-Mora states that he repeatedly told nurses that he was in pain and that he resorted to throwing items at staff in order to gain attention and treatment.

While Dr. Moultrie and Mr. Maximuangu both aver their belief that the pen would pass, what remains unclear from the information before the court is the reasonableness of that belief in light of Mr. Manzano-Mora's objective and subjective symptoms as well as the length of time that passed between his ingestion of the pen and his being taken to the hospital.  Beginning on January 2, 2022, mere days after he swallowed the pen, Mr. Manzano-Mora began consistently to complain of abdominal pain (*see e.g.* ECF No. 28-4 at 28, 30, 40, 49, 52, 65, 68, 78) and beginning on January 27, 2022, he complained of difficulty with his bowel movements with those complaints evolving from constipation to diarrhea and reports of blood in his stool (*see e.g. id.* at 55-56, 63, 68, 76, 78, 81).  Despite reporting blood in his stool on February 2, 2022, an apparent escalation of his symptoms, he was not taken to the emergency room until very late in the day on February 7, 2022.  Additionally, Dr. Moultrie relies on Mr. Manzano-Mora's ability to be distracted from his pain and lack of guarding and rebounding during examination but offers no explanation as to

whether Mr. Manzano-Mora's mental health problems and/or medications would have impacted these assessments.

Dr. Moultrie also seems to suggest that he was unsure at the outset of whether Mr. Manzano-Mora had in fact swallowed the pen and throughout his treatment was unsure whether the pen remained in Mr. Manzano-Mora. Yet, after Mr. Manzano-Mora's first scheduled x-ray was not taken, there is no evidence that anyone attempted to reschedule the x-ray until Mr. Manzano-Mora requested that he return to JCI for the x-ray. Further, there is no explanation as to why Mr. Manzano-Mora was not immediately taken to the emergency room for an x-ray to confirm he had swallowed the pen. In contrast, when Mr. Manzano-Mora was confined at JCI and reported that he had swallowed a paper clip he was immediately taken to the emergency room for both an x-ray and CT scan. No explanation is offered as to this discrepancy in treatment protocol.

As to Dr. Moultrie's suggestion, both in the medical records and in his affidavit, that he was unsure whether the pen remained in Mr. Manzano-Mora, there is no information provided to the court as to what, if any, efforts were made or should have been made to check Mr. Manzano-Mora's stool to determine if the pen had been excreted.

The court cannot say on the limited record before it that Dr. Moultrie and Lum Maximuangu were not deliberately indifferent to Mr. Manzano-Mora's serious medical needs. As such, their Motion for Summary Judgment is denied. In light of Mr. Manzano-Mora's self-represented status and the likely need for discovery, counsel will be appointed to assist him.

## CONCLUSION

In light of the foregoing, Defendant Patuxent's Motion to Dismiss is granted. Defendant Olasehinde's Motion to Dismiss is granted. Defendants Dr. Moultrie and Mr. Maximuangu's

Motion to Dismiss or in the Alternative Motion for Summary Judgment, construed as a motion for summary judgment is denied.  A separate Order follows.

                                        /s/
                              _____
                              DEBORAH K. CHASANOW
                              United States District Judge